## SANTIE v. MESECK STEAMBOAT CO., Inc.

District Court, S. D. New York.

May 9, 1941.

George A. Grabow, of New York City, for plaintiff.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan and Frederick H. Cunningham, both of New York City, of counsel), for defendant.

INCH, District Judge.

The plaintiff John Santie, a member of the crew of the steamship Americana brings this action under the Jones Act, U.S.C.A. Title 46, Sec. 688, to recover for personal injuries sustained on the 22nd day of July 1939. Santie was the bartender on the steamship and the action is brought against the Meseck Steamboat Company owner of the vessel.

Two causes of action are set forth in the complaint, the first and most important one being for alleged negligence, the other being for maintenance and cure.

While the complaint sets forth a series of alleged omissions on the part of the defendant, the facts at the trial were substantially confined to two things. First, an alleged negligent fire that started and was extinguished on the Americana. Second, alleged negligence on the part of the second officer and acting mate of the vessel during the fire.

As to the first, the cause of the fire, I think it is plainly shown that any such cause of injury to the plaintiff was not the proximate cause. The plaintiff claims that he received his injury by his pushing his hand through a window, severely cutting his wrist and the tendons and nerves and resulting in a serious and permanent, to some extent at least, injury to that member. He was not burnt. Plaintiff not only failed to clearly and sufficiently prove the cause of the fire as due to negligence, yet, assuming that on other and more definite facts being shown, a court might find that the fire had been caused by some neglect,

such a fire would not be the proximate cause of the injury complained of by plaintiff in this action on the facts of this case.

It is therefore the second reason for plaintiff's injury that is the real basis for his action.

The Americana was an excursion steamer operating during the summer months between the Battery, New York City, New York, and Rye Beach, New York. On July 22, 1939, the Americana left the Battery at 10:25 A.M. She carried some 1,-500 passengers. When she had been out about five minutes and was about abreast of Corlears' Hook, the purser, Dombroski, and the second officer, Daniels, smelled smoke. The second officer immediately went up on deck and the purser went outside the ship to look for the cause. Soon the purser came back and notified the second officer that the fire was located in a certain room on the first deck, which was used as a dressing room by the women performers employed in the show which was a part of the entertainment given on the trip.

This room was a small room, 8 feet 9 inches long, by 10 feet 2 inches wide, with two windows on the ship's side.

One of these windows was closed, the other was open midway. It was by the smoke seen coming from this open window, by the purser, that he was able to immediately locate the fire as aforesaid. The door to this room was locked and there was no one in the room at that time.

It was, of course, extremely necessary to extinguish the fire as soon as possible without allowing any information to be given to the crowd of pleasure seekers on board which undoubtedly would cause panic with possible serious results. As the exact extent of the fire was then unknown the second officer who was in command and as was his duty lost no time in ascertaining its extent and extinguishing it.

In considering therefore, the action of this officer, care must be exercised to take into fair consideration the duty of this officer, the emergency which confronted him, a situation fraught with possible great peril to a moving vessel, loaded with 1,500 passengers, the necessity for immediate action and the result of this officer's promptly taking the necessary steps causing the quick extinguishing of the fire without apparently any of the passengers being aware of the danger that had threatened.

The plaintiff, however, now claims that this officer was negligent. In my opinion, not only was this officer (Daniels) not negligent, but the unfortunate injury suffered by the volunteer, Santie, was the result of his own act at a time when he was in a highly excitable condition, due to a situation into which he had rushed, but which had no connection with any act of the second officer. I agree with counsel for the defendant that, "the conduct of Daniels was the ordered acts of an experienced seafaring officer engaged in effectively fighting a fire where every minute was of the essence".

Although this does not agree with Santie's testimony at the trial, I am inclined to believe that Santie, at his post as bartender, nearby the room that was on fire, excitedly picked up the fire extinguisher, which had been already abandoned by Daniels, and, while Daniels was getting the fire hose, voluntarily rushed into the room where the fire was, the door having previously been unlocked. The door closed upon him after he entered and he found himself in a small room, filled with fire and smoke, and in this terrifying situation, became so panic strickened, that he even forgot that he could easily make an exit through the same door through which he had entered and which in cooler moments it would seem reasonable to believe he would have at once remembered, and fearful of being overcome injured himself in some frantic effort to escape and instead of using the doorway made his way as quickly as possible through the only exit he then thought of, that of a dangerous half open window on the side of the moving vessel.

It is difficult not to have great sympathy for this young man who so recklessly volunteered to do what he could to protect the ship and passengers from a fire blazing in this small room and who was gravely injured in so doing. But sympathy cannot take the place of proof or be a basis for liability of negligence on the part of the second officer performing his duty at a time when moments counted and, I am convinced, that for some days and weeks thereafter, Santie did not know himself just how he injured himself. There are witnesses to that effect.

The court had the advantage of seeing the witnesses and while there is a plain conflict of testimony, the testimony of the second officer seems to be a clear and rea-

sonable statement of what occurred. The testimony of Santie on the other hand, which will also be briefly stated, is in some instances incredible, although I do not doubt but that by the time of the trial, Santie believed it to be what actually occurred.

Daniels who was second officer and acting mate in charge on the day in question was an experienced officer, holder of a master's license in any ocean, any tonnage, also first class pilot, New York harbor, and at the time of trial had been in the employ of another steamship company or at least was not in the employ of the Americana.

He (Daniels), testified that "during the forenoon, shortly after leaving the Battery, the purser, Dombroski, and I smelled smoke. We had 1500 passengers aboard and we decided to keep the matter perfectly quiet until we discovered where the fire was. We found out that the fire was located in this room. Dombroski went outside the ship and in that way located the fire. He came back and notified me where it was. I had my everyday uniform on, as I was on duty. This consisted of a double-breasted coat, navy blue, brass buttons, two stripes showing my position as a second officer, and white officer's cap. I do not carry sea-boots, oilskins, southwesters, or anything of that kind, summertime. The fire was in the ladies dressing room, between the check room and the men's toilet, on the starboard side. It was locked. I got the key from the assistant purser and opened the door. Before I did this I took down the fire extinguisher. I then went into the room and saw the extent of the fire. The flame was overhead, in the left-hand portion of the room, traveling overhead along the ceiling. The hottest place was over the window, forward corner, facing the door. There was considerable smoke and flame, one of the windows was open part way; the ceiling was blazing, and the costumes worn by the women were also on fire; they were on hangers.

"I saw that the extinguisher would be of no service, so I came out of the room immediately with the fire extinguisher and left it outside the door. The ship was going full speed ahead".

Before the Marine Investigating Board in New York, Daniels had testified "when I reached up for the hose the door was open and I saw this fellow Santie, cafeteria man, run in there with the fire extinguisher".

Certainly, Daniels cannot be blamed for giving his undivided attention to getting an adequate water supply at once. He had entered the room with the fire extinguisher and instantly found it was inadequate. Daniels had then come out and placed the fire extinguisher on the floor near the door. This was no time to shout orders to the bartender or make Santie come out from the room where he didn't belong. Here was an emergency requiring instant action and Daniels stated before the same board (Marine Investigating Board) that, "I was the only one that went in to extinguish the fire, I thought he (Santie) would do the same thing I did", apparently meaning retreat from the room by the door.

What may have happened to Santie with the door closed and in this brief interval before Daniels came with the hose, has already been referred to, for Daniels saw no one in the room when he again opened the door for the purpose of using the hose.

Continuing, Daniels testified, after he found the fire extinguisher was of no value, "I then went out at once to get the hose which is in the companion-way. This hose is on brackets on a rack overhead and the nozzle of the hose was over the door where the fire was. It was fifty feet in length, connected with a hydrant at the other end. I took the nozzle off the bracket and then proceeded to shake off the rest of the hose from the bracket. When I got it off I proceeded to the door, which was still unlocked, pushed the door back with my foot, put the nozzle through the door and waited for the pressure of water. I could see all the objects in the room in spite of the smoke. I did not see anyone in the room, and I could have seen any such person if he had been there.

"As the fiercest part of the fire was in the ceiling overhead I faced the nozzle toward that and in a second or two the water came. We had 100 pounds pressure. I played the hose on the ceiling and this caused the water to be like a fountain. It hit the ceiling and spread and in about a minute or two the fire was out. When I found the fire was out I still had the pressure, and, as I did not want to fill the room with water I put the hose through the open window until the engineer was notified to shut off the pump. The stream of water went through the open window. It took me about a minute to put the fire out and another minute for the

engineer to shut the water off. My uniform was wet and my white cap was soiled from the charred wood and so forth, that came down.

"After the fire was out someone sent for me to see the bartender, saying that there was a man injured. I went down and saw him in the mess-room. He had his white uniform on, just as he wears when he works behind the bar, and this uniform was dry".

There is no dispute but that Daniels had taken the fire extinguisher into the room after the door was unlocked and saw at once that it would be inefficient and thereupon carried it out and placed it on the floor and that such fire extinguisher would be exhausted very quickly, (according to the testimony about one minute), and Daniels then proceeded down the companionway to get the hose up.

I will now refer to the testimony of Santie. I think one can see at once, in comparison with the clear and straightforward story of Daniels, why some of this testimony is incredible. I think no further comment need be made.

Santie is a young man 26 years old, worked as a bartender on the Americana, has also been a licensed chauffeur. He earned $30, a week in tips. At the time in question he was at the bar wearing a bartender's white coat. He testified: "I saw Farley, the assistant purser, fighting the fire through the cracks in the door with the fire extinguisher down on the deck. There had been no fire alarm. I jumped over the bar and picked up the fire extinguisher and applied it to the cracks of the door. I saw Daniels doing something maybe with the hose. He told me to go inside the room. I went in with the fire extinguisher and the mate closed the door on me. I seen a big fire in the back of the door, all dresses and different things were burning. There were flames and plenty of smoke. After he closed the door on me I was applying the fire extinguisher on the fire and it was getting me a little, the smoke was getting me, you know. I was gasping for air. One window was open, the other was closed. I stuck my head out, got some air and came in again and I was still applying the fire extinguisher, and then I got on my belly, laid down near the ground on the floor of the room, still applying the fire extinguisher, and I was a little comfortable there, but after I got up the smoke was going outside of the window, and it was getting me more, so I went into the far end of the room on the left side, fighting the fire from the couch. I was kneeling with my left foot on the couch, my left knee on the couch, and applying the fire extinguisher. The door was closed. The mate came in the door. He had a fisherman's hat on and a raincoat. The pressure came in so fast, like a bullet, and the water hit me off the shoulders in the back. I was facing my back toward him. I was sort of on a side. I had a white jacket on. When I lifted it off my bare skin came out. That is where he hit me. I went off balance and my wrist went through the glass of the window. I know I went through a window, that is all. I got up after I fell, put the fire extinguisher down, and crawled out through the other open window; I lifted it a little bit open with my neck. My right wrist went through the window; the blood spurted in my face; I was in pain. I made my way along the catwalk outside of the vessel, about 12 or 15 inches wide. I walked backwards, holding with my left hand. Some woman pulled me in through my head by grabbing my hair. She was a stewardess on the ship".

The above therefore is the testimony of the main witnesses. I have no hesitation in believing that of Daniels as being the correct and truthful account.

Counsel for plaintiff argues that Santie was injured by the carelessness of the second officer (Daniels) carelessly turning the stream of water at high pressure upon him without at first warning him. In my opinion, Santie had already gone out the window in a panic strickened condition and was not in the room. But even if he had been there, however unfortunate the accident, it was not careless on the part of the second officer to immediately turn the hose on the fire, and besides I believe Daniels that it was directed at once at the ceiling, where most of the fire was and this extinguished the blaze within a minute or so, and also it is incredible that had he been in this small room with the door open and the officer standing there a few feet away that he should not cry out and seek to go out this door, but should instead crawl out a half open window on to the side of the boat.

Inasmuch as I do not believe any negligence on the part of the defendant was shown, that was the proximate cause of the injury to Santie, that portion of the complaint must be dismissed.

The remainder relates to the cause of action for maintenance and cure. In view of what was done for Santie it is somewhat difficult to find further responsibility on the part of defendant.

However, Doctor Palmer, chief of the Surgical Service, United States Public Health Service, Stapleton Marine Hospital, Staten Island, was called as a witness for the defendant and at the request of plaintiff this doctor was allowed to examine the hand of the plaintiff and apparently this disinterested specialist whose qualifications were unchallenged gave testimony to the effect that more than likely, in his opinion, an operation would restore to plaintiff a good working hand and that he himself would perform the operation and do it at the Marine Hospital with no cost to the plaintiff.

There is no necessity to go into detail as to the testimony of Doctor Palmer, but counsel for defendant urge that the operation if allowed should take place as soon as possible and states: "accordingly, viewed in the light of circumstances most favorable to Santie, he should be limited to a period of one year less all days as an in-patient for the operation, plus the interval of July 22, 1939, the date of the accident, until December 14, 1939, the date of his last discharge from the hospital, deducting however, all days during which plaintiff was an in-patient at the hospital". That certainly would adequately cover his maintenance and cure. There is no authority allowing any period in excess of the above.

This, it seems to me, can be taken advantage of by the plaintiff if he desires to promptly have Doctor Palmer explore his hand and if, of the same opinion, operate as indicated.

Accordingly, under this cause of action the opportunity should be given plaintiff, within the limitations expressed, to have such an operation performed, provided he presents himself promptly to the hospital. Otherwise anything further under this second cause of action is not allowed.

As I have come to the conclusion that there is no liability for negligence and except for the statement of counsel above indicated as to maintenance and cure from which I imply a consent, no further liability, the complaint is dismissed, with costs.

Submit findings of fact and conclusions of law.